994 So.2d 69 (2008)
Cynthia HARRIS
v.
DELTA DEVELOPMENT PARTNERSHIP, Seale, Macaluso & Ross Building Partnership, Milton R. Ballard, John R. Ballard and ABC Insurance Company.
No. 2007 CA 2418.
Court of Appeal of Louisiana, First Circuit.
August 21, 2008.
*72 David L. Bateman, Baton Rouge, Louisiana, for Plaintiff/Appellant, Cynthia Harris.
Nahum D. Laventhal, Metairie, Louisiana, for Defendant/Appellee, Delta Development Partnership.
Before GAIDRY, McDONALD, and McCLENDON, JJ.
GAIDRY, J.
A guest at an apartment building, injured as the result of a trip and fall, appeals a judgment entered on a jury verdict in her civil action for damages against the complex's owner. For the following reasons, we affirm the judgment in part, but reverse in part and amend the judgment on the issue of general damages.

FACTS AND PROCEDURAL HISTORY
The plaintiff-appellant, Cynthia Harris, is a certified nurse practitioner. On February 22, 2002, she drove a friend, Herd Stanley Guice, from New Orleans to his apartment in the Pinewoods Apartments in Watson, Louisiana. The apartment complex, constructed around 1982, was owned and managed by Delta Development Partnership (Delta). The apartment building at issue consisted of eight apartments, with four apartments per side (two downstairs, two upstairs), separated by an open breezeway with a stairway to the upper floor. Each apartment had an exterior light near its doorway.
When plaintiff and Mr. Guice arrived at his apartment complex after 8:00 p.m. that evening, it was dark outside. Mr. Guice exited the automobile and entered the breezeway where the entrance to his ground-floor apartment was located. His doorway was located beneath the upper floor landing. After setting his small overnight bag down in front of the doorway, Mr. Guice retrieved his keys and opened the door. Leaving the overnight bag in the threshold of the doorway, he walked inside to turn on the apartment's interior and exterior lights, located about nine feet down the entrance hall past a double closet. At about the same time that Mr. Guice reached the light switch, plaintiff tripped over his overnight bag and fell, immediately complaining of severe pain in her left ankle. At the time of the accident, no exterior lights were illuminating the breezeway or the apartment doorway.
Following the accident, plaintiff was taken to the Lake After Hours emergency clinic in Baton Rouge, where she was examined and x-ray films of her left ankle were taken. She was diagnosed as having sustained a fracture of the left distal fibula, and a short leg splint was applied. She was also prescribed pain medication and instructed to consult an orthopedic surgeon for followup care. That physician, Brent Bankston, M.D., diagnosed the fracture as involving the left lateral malleolus of the ankle. Although the ankle fracture resolved without complications within a matter of months, plaintiff began to complain of shoulder and neck pain, and consulted a number of other specialists. She was later diagnosed as having two cervical disc herniations or protrusions. Although surgery was recommended, she initially opted to forego the recommended surgical procedure, and had not undergone surgery as of the time of trial.
Plaintiff filed her petition for damages on February 21, 2003. Named as defendants *73 were Delta and its three constituent partners, as well as Scottsdale Insurance Company.[1] The three partners were subsequently dismissed as defendants.
The case was tried before a jury on August 8-11, 2006. At the conclusion of the trial, the jury returned a verdict finding Delta negligent and specifically finding that the condition of the lighting at the apartments presented an unreasonable risk of harm. The jury also found Mr. Guice and plaintiff negligent, and apportioned the following percentages of fault to the parties: defendant: 17%; plaintiff: 17%; and Mr. Guice: 66%. The jury awarded plaintiff $3,000.00 for past medical expenses and $12,000.00 for past loss of earnings, but declined to award any damages for the elements of past and future pain and suffering, past and future mental anguish and emotional trauma, future medical expenses, future loss of earnings, disability and scarring, and loss of enjoyment of life.
The trial court signed a judgment incorporating the jury's findings on September 25, 2006, rendering judgment in favor of plaintiff and against defendant Delta for the net sum of $2,550.00, with legal interest and all costs.[2] On October 4, 2006, plaintiff filed a motion for judgment notwithstanding the verdict or alternately a new trial After the trial court denied that motion by judgment signed on January 23, 2007, plaintiff instituted the present devolutive appeal.

TIMELINESS OF APPEAL
In its brief, defendant raises the point that plaintiffs motion for JNOV filed on October 4, 2006 was untimely, and therefore her motion for a devolutive appeal, filed well over sixty days from the mailing of the notice of judgment, was likewise untimely. The trial court rejected defendant's argument. We conclude that the trial court was correct in doing so, and also find no merit in defendant's argument. After correctly observing that the delay for filing a motion for JNOV or new trial is seven days, exclusive of legal holidays, from the date of mailing of the notice of judgment, defendant incorrectly contends that the seventh day was Monday, October 2, 2006. The notice of judgment was mailed on September 25, 2006. The seventh day, exclusive of the legal holidays of Saturday, September 30, and Sunday, October 1, was in fact October 4, 2006. Plaintiffs motion for JNOV was clearly timely, and her appeal is likewise timely.

ANALYSIS

Liability and Allocation of Fault
A determination of negligence or fault is a factual determination. In order to reverse a factual determination by the trier of fact, the appellate court must apply a two-part test: (1) the appellate court must find that a reasonable factual basis does not exist in the record for the finding; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993). Further, when factual findings are based upon determinations regarding *74 the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The allocation of comparative fault between joint tortfeasors is also a factual determination, and the trier of fact's allocation is therefore owed deference. Snearl v. Mercer, 99-1738, p. 27 (La.App. 1st Cir.2/16/01), 780 So.2d 563, 584, writs denied, 01-1319 (La.6/22/01), 794 So.2d 800 and 01-1320 (La.6/22/01), 794 So.2d 801. The supreme court articulated the factors appropriate for consideration in allocating fault between two or more parties in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985):
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Prior to articulating the foregoing standard, the supreme court in Watson made a point of observing that "appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court." Id., 469 So.2d at 972. Proper review requires the appellate court to determine whether that finding, even if supported by evidence, was clearly wrong or manifestly erroneous. Id., Stating the principle somewhat differently, the court concluded:
It is not enough to sustain the determination of the district court when "there is some reasonable evidence to support the finding." Rather, the appropriate question is, was that finding clearly wrong or manifestly erroneous.
Id.
Thus, a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882 (La. 1993).
Mr. Guice testified that he first moved into his apartment in Watson within a day or two following the signing of his lease on February 1, 2002. He and plaintiff arrived at his apartment from New Orleans sometime after 8:00 p.m. on the accident date of February 22, 2002. He exited the passenger's side door and walked on a sidewalk toward his apartment. He was using a cane in his left hand, and had his overnight bag hanging from his right shoulder. No porch lights for any of the apartments were lit. Upon reaching his apartment door within the breezeway, he hooked the cane over his left arm, dropped the overnight bag, and retrieved his key to unlock the door. After opening the door, he walked into the apartment toward the light switch panel, located past a double closet. At about the same time he reached the *75 panel, he heard plaintiff fall and scream. Under cross-examination, Mr. Guice conceded that he had never complained about the exterior lighting situation prior to the accident, and that he told plaintiff that it was his fault for leaving his bag in the doorway.
Ms. Harris testified that she had previously been to the apartment complex with Mr. Guice on two to three occasions, but could not recall whether she had previously been there at night. On the day of the accident, she had attended an employment interview in New Orleans, and she and Mr. Guice drove to Watson after the interview. Mr. Guice was suffering from hip disease and was a candidate for hip replacement, and had difficulty driving, so plaintiff drove. Upon arriving, Mr. Guice got out and walked on a sidewalk toward his apartment. After retrieving her purse and a partially-disassembled computer hard drive, plaintiff proceeded down the sidewalk to the apartment. She described the lighting in the parking lot and sidewalk area as "dark," but not "pitch dark," admitting that she "could see ... well enough to walk." After turning into the breezeway separating the opposite sides of the apartment building, the lighting became "a lot darker" close to the apartment's door. Plaintiff recalled that none of the apartments had their exterior doorway lights on, and confirmed that the building had no other permanent lighting in the breezeway area. Plaintiff described the circumstances of the accident from that point:
Well, I was already in motion walking and as I came here, the light began to get dimmer but I could still see and I was looking ahead of me, you know, I could see the door way. But I really couldn't see anything dark on the ground and I tripped as I went through the doorway on his overnight bag.
Under cross-examination, plaintiff recalled that she did not see Mr. Guice at the doorway as she approached it, and that she did not slow or adjust her pace of walking as she approached the darkened open doorway. She admitted that there was some light within the apartment, probably from a parking lot light, coming through a glass sliding patio door in the back of the apartment.
JoAnn Elgin testified that she was the resident manager of the apartment complex since May 1977. She admitted that the apartment building breezeways were "dark" at night, and that there was "not a lot of light," but that there was "visibility." She claimed that she had no problem seeing the apartment doorways at night, but admitted that someone else might have a problem. Although she admitted discouraging tenants from placing rugs in front of their doorways, she explained that she discouraged the placement of any type of potential tripping hazard in areas of common traffic, regardless of the issue of lighting. Ms. Elgin stated that she had received some prior complaints or comments from tenants about lack of lighting, but explained that they related to the issue of security. The testimony of defendant's property managers, Joseph Holmes and Clara Holmes, was presented by deposition. Mr. Holmes was unaware of any reported problems or complaints related to the apartment buildings' lighting, and was likewise unaware of any prior reported accidents involving tripping or falling on the premises. Ms. Holmes believed that the apartment buildings were built around 1982 or 1983. She also denied any knowledge of prior complaints about lighting in the breezeways.
Plaintiff called Mr. Michael Frenzel as an expert safety consultant with experience in hazard recognition, evaluation, and control. Mr. Frenzel conducted two site *76 inspections on January 27, 2003, and August 16, 2004, and took the photographs introduced into evidence. It was his understanding that none of the eight apartments' exterior doorway lights were on at the time of the accident, and he concluded that the light from the closest street light would not have provided much indirect light He explained that the State Fire Marshal's office requires all buildings to conform to the standards of the Life Safety Code published by the National Fire Protection Association. The Life Safety Code requires that there be at least one foot-candle of lighting along the floor level of a building's means of egress. The apartment building's breezeway constituted the means of egress for the apartments. Mr. Frenzel testified that if all eight exterior doorway lights were continuously lit, they might have satisfied the Life Safety Code's minimum lighting requirement. He emphasized, however, that the Code also specifically required that "any required illumination shall be so arranged that the failure of any single light unit such as the burning out of an electric bulb will not leave an area in darkness."
Mr. Frenzel further testified that he did not actually measure the quantity of light at the accident location at night, on the grounds that there was no need to do so. Mr. Frenzel explained that it was obvious from the layout of the building and the breezeway and the fact that the exterior lights were unlit that the lighting at the time of the accident would not have met the Code's requirement. He also pointed out that Delta's expert measured the lighting at night, and those readings were well below the Code's requirement, thereby creating an unacceptable level of risk, or a dangerous condition. He conceded, however, that "[t]here was enough light ... reflected off of [sic] trees and other buildings and such to be able to give you some perspective of where you were, but not necessarily to see clearly things on the ground, for example."
Mr. Frenzel testified that plaintiff's carrying of the hard drive did not constitute unreasonable conduct, as carrying objects is normally not a dangerous activity. He also expressed the opinion that it was not particularly unreasonable for Mr. Guice to have placed his overnight bag down in order to open the door and enter the apartment to turn on the lights. He explained that the absence of lighting was what made the overnight bag a hazard. Finally, Mr. Frenzel admitted under cross-examination that he found no Code violation regarding the distance of the light switch inside the apartment from its doorway.
Nickie Cammarata, a civil engineer, testified as an expert witness on behalf of Delta. After being retained as a consultant, Mr. Cammarata inspected the premises at issue on April 12, 2005, at about 9:00 p.m. He noted that a portion of the breezeway was somewhat illuminated from light coming from a parking lot light, and that he could not characterize the breezeway area as being "pitch black" during his inspection. Using a light meter, he measured the light on the sidewalk leading from the parking lot to the breezeway and within the breezeway itself. The light in the sidewalk area between the parking lot and the building measured at .3 foot-candles. The light at Mr. Guice's apartment door, with all exterior doorway lights unlit, measured .2 foot-candles.
Mr. Cammarata confirmed that the Life Safety Code and the Standard Building Code require that a building's means of egress have at least one foot-candle of light until a public way is reached, and admitted that the breezeway's lighting violated the applicable code provisions. However, he stated that he was able to see *77 while in the breezeway during his inspection, and provided the example that the codes permit aisles or passageways in movie theaters to have illumination as low as .2 foot-candles while showing movies.
It is well settled in Louisiana that the trier of fact is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. See Williams v. Rubicon, Inc., 01-0074, p. 5 (La.App. 1st Cir.2/15/02), 808 So.2d 852, 858. The trier of fact may accept or reject in whole or in part the opinion expressed by an expert. See Wade v. Teachers' Ret. Sys. of La., 05-1590, p. 8 (La.App. 1st Cir.6/9/06), 938 So.2d 103, 108, writ denied, 06-2024 (La.11/3/06), 940 So.2d 673.
Reviewing the entire record and applying the Watson factors to the respective conduct of defendant, Mr. Guice, and plaintiff, we cannot conclude that the jury's apportionment of percentages of fault was clearly wrong and contrary to the evidence. Based upon the evidence and its assessment of the witnesses' credibility, the jury made a considered determination that the lighting was not as significant a contributing factor in the occurrence of the accident as Mr. Guice's negligence. Mr. Guice admittedly was aware that plaintiff would be following him toward the apartment doorway when he entered the apartment to turn on the lights. The overnight bag was not large, and presumably could easily have been picked up and brought into the apartment by Mr. Guice after he unlocked the door. Additionally, Mr. Guice admitted that he had not left his exterior light on, as was his usual custom, and there was evidence suggesting that that light's bulb was burned out at the time the accident occurred, preventing it from adding light to the location.[3]
The jury also obviously concluded that plaintiffs actions in failing to maintain a proper lookout while walking in a darkened area and in choosing to enter the still-dark apartment while carrying the computer hard drive before her were as significant in terms of causing the accident as the inadequate illumination.[4] Additionally, the jury no doubt gave substantial weight to the absence of any other accidents attributable to the apartments' lighting situation over the prior twenty years.
After careful consideration of the record, we find that its ultimate determination is supported by the evidence and entitled to deference. We therefore affirm the judgment incorporating the jury's findings and apportionment of fault.

Causation and Nature of Injuries
The trial court's finding regarding causation is a factual finding and must be reviewed under the manifest error standard. Robling v. Allstate Insurance Company, 97-0582, p. 4 (La.App. 1st Cir.4/8/98), 711 So.2d 780, 783. In a personal injury suit, the plaintiff has the burden of proving by a preponderance of the evidence a causal connection between the injury sustained and the accident which *78 caused the injury. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injury was caused by the accident. Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615, p. 3 (La.2/20/95), 650 So.2d 757, 759.
Plaintiff testified that immediately after she fell, she felt excruciating pain from her left knee to her foot, and was unable to walk because of the pain. At the Lake After Hours emergency clinic, x-ray films were taken and she was given an injection of Demerol for pain and a prescription for pain medication. The following day, she remained in bed with her leg propped up and took pain medication. She saw Dr. Brent Bankston that day, and he replaced the temporary splint applied at the emergency clinic with an open cast or splint. She had to use crutches for a time, as the cast was a non-walking cast. Because of her injuries, she was not able to begin working in her new job as a nurse practitioner at Tulane University Medical Center internal medicine clinic until May 20, 2002.
Plaintiff testified that she began to experience right shoulder pain about one to two weeks after the accident. She admitted that she had bursitis in that shoulder on one occasion prior to the accident, but that the problem was brief and had responded to treatment. Three weeks after the accident, plaintiff still had ankle pain, and told Dr. Bankston that she also had shoulder and neck pain. Dr. Bankston gave her a steroid injection for the shoulder pain. When she continued to complain of neck pain, Dr. Bankston recommended an MRI study. Based upon the results of that study, Dr. Bankston recommended that she consult a neurologist, and referred her to the Neuromedical Center in Baton Rouge. She initially saw Dr. Scott Nyboer at the Neuromedical Center, and he referred her to Dr. Sandra Weitz for epidural steroid injections for her neck pain. The injections gave plaintiff only temporary relief, and Dr. Nyboer recommended physical therapy and referred her to Dr. Thomas Flynn, a neurosurgeon. Dr. Flynn ordered an additional MRI study, as well as a myelogram and post-myelogram CT scan. Based upon the results of those tests, Dr. Flynn recommended a two-level laminectomy and fusion. Plaintiff testified that she elected not to undergo the surgery, as she was afraid of the risks involved and the possibility of an unsuccessful outcome. She did not see Dr. Flynn after November 22, 2002, which she attributed in part to the fact that her employer's health insurer would not pay for the visits.
Plaintiff testified that she took pain medication, performed home exercise, and used a heating pad from 2002 through 2004 to attempt to manage her neck pain. In 2004, she took two leaves of absence from her job due to her neck pain, headaches, anxiety, and depression. Plaintiff's job position with Tulane was eliminated effective January 7, 2005, due to organizational changes in the internal medicine clinic. On the recommendation of her supervising physician at work, she consulted another physician, Dr. Cho, who recommended medication, electrical stimulation therapy, and acupuncture. Plaintiff was treated by Dr. Cho from October 2004 through August 2005, but was forced to discontinue her treatment due to Hurricane Katrina. After evacuating to Baton Rouge, she sought treatment for her neck, right shoulder, and arm pain from Dr. Gray Barrow, who recommended that she continue with pain medication and home exercise and gave her trigger point injections. Plaintiff eventually consulted Dr. Jorge Isaza, who ordered another MRI study and recommended cervical spine surgery, which *79 plaintiff testified she was willing to undergo as of the time of trial. Plaintiff testified that she has been unable to secure employment since she was laid off by Tulane, which she attributed in part to her need for pain medication to manage her symptoms.
With regard to her medical history prior to the accident at issue, plaintiff testified that she had been involved in some accidents and sustained "minor injuries," but had not been injured "to any great extent." She also admitted to a prior low back problem in the 1990s for which she received treatment from one of Dr. Flynn's partners, but denied any prior neck problems, other than minor "crick[s]" in the neck. Under cross-examination, plaintiff admitted that she was treated for low back pain in 1998 by Dr. Mayfield, her primary care physician, who prescribed Lortab, a pain medication, and that she had continued severe low back pain in March 2000, for which she was prescribed Lortab and Soma. She also admitted that she may have been prescribed Lortab and Soma by Dr. Mayfield on February 15, 2002 (a week prior to the accident). Plaintiff further admitted that she may have mentioned being involved in four motor vehicle accidents within a year to Dr. Mayfield in connection with treatment for a "crick" or "strain" of the neck in 1997. Although she admitted to being involved in prior accidents, she could not recall filing two prior lawsuits for her injuries from motor vehicle accidents in 1993 and 1996, but did recall being sued as the result of another motor vehicle accident in 1997.
The testimony of Brent Bankston, M.D., the orthopedic surgeon to whom the emergency clinic had referred plaintiff, was presented by deposition. He testified that on February 27, 2002, plaintiff was complaining of ankle pain, and he diagnosed a non-displaced fracture of the lateral malleolus of the left ankle. Dr. Bankston confirmed that there was no history of any other injury on that initial visit. He described the mechanism of that injury as excessive rotation of the ankle. Because there was no tenderness of the ligaments on the other side of the ankle, Dr. Bankston concluded that the injury was stable. Plaintiff was placed in a short leg splint. On her second visit of March 8, 2002, x-ray films confirmed no displacement of the fracture and that surgery would not be necessary. Plaintiff was placed in a full cast and advised not to put any weight on her ankle for another two weeks. When she returned two weeks later, Dr. Bankston noted that she still had some ankle pain, and was also complaining of right shoulder pain. Plaintiff advised him that she had a prior history of bursitis in that shoulder, and he found a positive impingement sign, consistent with bursitis, on examination. Dr. Bankston gave plaintiff an injection and prescribed exercises for the shoulder, the cast was replaced with a removable cast boot, and plaintiff was instructed to start bearing weight on her ankle. On April 11, plaintiff was again examined and reported no problems with her ankle, although she had continued shoulder pain and a positive impingement sign. The removable cast boot was replaced with a small air cast splint. On April 30, 2002, plaintiff advised Dr. Bankston that she still had some ankle pain, but it was improving and she was wearing regular shoes.
On the April 30 visit, plaintiff reported continuing shoulder pain, but also first reported pain in the back of her neck, running down the side of her right shoulder and sometimes down to the hand, with numbness in the index finger. She attributed her increase in symptoms to her shoulder therapy regimen. Although plaintiff had a good range of motion of the neck and shoulder and no motor or sensory problems on examination, Dr. Bankston *80 suspected a herniated cervical disc, and ordered an MRI study of the neck. The MRI study revealed a right paracentral disc protrusion at the C4-5 level and an osteophyte disc complex at the C5-6 level. According to Dr. Bankston, those findings were not unusual and "very common" for a person of plaintiff's age (49). When Dr. Bankston last saw plaintiff on May 16, 2002, she had no complaints regarding her ankle, but still had complaints of neck and arm pain and numbness.
Dr. Bankston was of the opinion that plaintiff's ankle fracture was "not a serious injury" and probably healed two months after the accident, at which time she was released to return to work without restrictions related to the ankle. As to the relationship between plaintiff's shoulder complaints to the accident, Dr. Bankston noted that he had discussed with plaintiff the manner in which she had fallen, and could not correlate her shoulder complaints with her fall. He had a similar opinion with regard to the cervical disc problems, stating that he would expect a person with an acute disc herniation to have immediate symptoms, but admitted later in his testimony that he did not have an opinion as to the causal relationship between the fall and the MRI findings. As he did not perform spinal surgery as part of his orthopedic practice, Dr. Bankston referred plaintiff to the NeuroMedical Center for further evaluation of her neck complaints.
The testimony of Thomas B. Flynn, M.D., a neurosurgeon practicing with the Neuromedical Center, was presented by deposition. Dr. Flynn testified that plaintiff initially was seen at the Neuromedical Center by Dr. Nyboer, a specialist in physical medicine and rehabilitation. Plaintiff had undergone cervical traction and epidural steroid injections on Dr. Nyboer's recommendation, but those treatments were not successful in relieving her neck and right arm pain. She was then referred to Dr. Flynn, who first saw her on September 12, 2002. In addition to her neck and arm pain, plaintiff was also complaining of numbness, tingling, and weakness of the right arm. Dr. Flynn recommended an electromyogram, which was performed by Dr. Nyboer and was negative for evidence of nerve root irritation. A myelogram and post-myelogram CT scan confirmed the findings on the prior MRI study. Based upon the persistence of her symptoms and the diagnostic studies, Dr. Flynn advised plaintiff on November 15, 2002, that she was a candidate for an anterior cervical discectomy and fusion. However, he never saw plaintiff after that visit. On the issue of the causal relationship of the accident to the cervical problems, Dr. Flynn agreed that the accident could be responsible for plaintiff's cervical symptoms, assuming that the onset of the symptoms was reported to Dr. Bankston three weeks after the accident, "relying absolutely totally on the patient's history," and "[i]f she had an onset of these symptoms within days or a week or two following the accident."
Plaintiff was treated by John Ball, M.D., an internal medicine specialist with whom she worked at Tulane, from June 2003 until his retirement in October 2004. He initially diagnosed cervical radiculopathy, based upon a prior history of a neck injury, and a cervical strain, brought on by activity involved in changing her residence. During the time that he treated plaintiff, she had pain every day, and complained that her symptoms were gradually getting worse. Dr. Ball was of the opinion that her cervical disc disease was related to the trauma from the accident, but he could not say whether it was caused by the accident or aggravated by the accident. With regard to the issue of the delayed onset of cervical complaints relative to causation, *81 Dr. Ball further explained: "As far as the pain is concerned, if they [sic] had pain in two months [after the accident], I would have expected them to have pain the whole two months. From the time of the incident up until the two-month period of time, I would expect that to be an acute strain kind of problem and not necessarily accompanied by x-ray findings or any other type of imaging that you could do but accompanied by symptoms."
Dr. Ball referred plaintiff to Myungho Cho, M.D., a physician practicing internal medicine and pain management. Dr. Cho's testimony was presented by deposition. He testified that he first saw plaintiff on October 11, 2004. Despite treatment with trigger point injections, medication, and a TENS unit, plaintiff's symptoms did not significantly improve over the course of treatment. Based upon her history and the duration and level of her pain, Dr. Cho believed that she would continue to have chronic pain in the future.
The testimony of Gray W. Barrow, M.D., a specialist in physical medicine and rehabilitation, was also presented by deposition. Dr. Barrow first examined plaintiff on November 10, 2005. Her neurological examination was normal at that time, but she did exhibit a "trigger point" in the right upper trapezius muscle, which Dr. Barrow felt was a secondary or referred manifestation of her neck injury. He concluded that the primary source of plaintiff's neck and related right arm symptoms was the C4-5 disc protrusion, although the C5-6 disc problem was possibly involved as well. He did not believe that plaintiff's complaints of headaches were related to the accident.
Dr. Barrow explained that most disc problems are attributable to "cumulative trauma," and that only twenty percent of disc herniations are associated with an isolated major traumatic event. Dr. Barrow assumed, based upon plaintiff's history, that her neck symptoms related to the C4-5 disc protrusion began with the fall at issue. He acknowledged, however, that disc abnormalities are common in 50-year-old individuals with signs of cervical spine degeneration, and that the degenerative process could cause a disc protrusion without trauma. With regard to the issue of the delayed onset of plaintiff's neck symptoms, Dr. Barrow admitted that he did not know whether the onset could be delayed for a month following the fall. He explained that in his experience, it might take "days or sometimes even a week" following trauma for such symptoms to manifest themselves. Although he agreed that plaintiff would be a candidate for surgery if she could not tolerate her symptom level, he did not recommend surgical intervention based upon her symptoms during his course of care.
Finally, the testimony of Jorge Isaza, M.D., an orthopedic surgeon and Dr. Bankston's partner, was presented by deposition. Dr. Isaza first saw plaintiff in January 2006 regarding complaints of neck and right arm that she related to the accident at issue. Based upon his examination and review of prior diagnostic studies, Dr. Isaza agreed that Ms. Harris had a disc protrusion at the C4-5 level and a osteophyte (bone spur) disc complex at the C5-6 level. He ordered a new MRI study, which revealed that the C5-6 disc had "collapsed" or decreased in height since the prior study. He discussed and recommended surgical treatment of both disc levels. On the issue of causation, assuming a history of onset of neck pain within one to two weeks after the accident, Dr. Isaza felt that the cervical disc symptoms were caused by the accident.
Plaintiff introduced evidence that she had incurred medical and pharmaceutical *82 expenses of $16,522.28. Because a jury was the trier of fact in this matter, we do not have the benefit of detailed reasons for its findings of fact and awards of damages. However, it is quite obvious from the amounts of the awards for past medical expenses ($3,000.00) and past loss of earnings ($12,000.00, approximately two months' earning capacity in plaintiff's occupation) that the jury found that plaintiff's cervical symptoms and disc abnormalities were not caused by or related to the accident at issue. Given that these findings were largely based upon credibility determinations and weighing of conflicting evidence by the jury, we cannot disturb them as long as the record provides a reasonable factual basis for them. The record clearly supports the conclusion that there were two permissible views of the evidence relating to the nature and causation of the claimed injuries, and that the jury was ultimately required to base its decision upon plaintiff's credibility, the accuracy of the underlying history, and the findings of the expert witnesses. Because there is a reasonable factual basis in the record to support the jury's credibility determinations and factual conclusions, the jury was not clearly wrong in choosing to award less than the full amount of medical expenses claimed to have been incurred as a direct result of the accident at issue. For the same reasons, we find no manifest error in the jury's refusal to award damages for future medical expenses.

General Damages
In Leighow v. Crump, 06-0642, pp. 10-12 (La.App. 1st Cir.3/23/07), 960 So.2d 122, 128-29, writs denied, 07-1195 (La.9/21/07), 964 So.2d 337 and 07-1218 (La.9/21/07), 964 So.2d 341, we analyzed the jurisprudence relating to the standard of review in personal injury cases where special damages were awarded, but no general damages were awarded:
Louisiana jurisprudence has long held that where there is a factual finding that a plaintiff was injured and incurred medical expenses as a result of another's fault, the failure to award general damages is legal error, which requires the reviewing court to assess, de novo, the amount of general damages appropriate under the circumstances. Marcel v. Allstate Ins. Co., 536 So.2d 632, 635 (La. App. 1st Cir.1988), writ denied, 539 So.2d 631 (La.1989). However, in Wainwright v. Fontenot, 00-0492 (La. 10/17/00), 774 So.2d 70, our supreme court established an "abuse of discretion" standard of review for claimed inconsistency in damage awards, carving a narrow exception to the fact scenario underlying the jurisprudential general rule. In Wainwright, the supreme court held that "the particular facts of each case are ultimately determinative" as to whether awards for different elements of damages in personal injury cases are inconsistent, and that "there is no bright line rule at work" in situations where special damages are awarded but no general damages are awarded. Wainwright, 00-0492 at pp. 8-9, 774 So.2d at 76. Thus, while it is still true that "a jury verdict awarding medical expenses but simultaneously denying damages for pain and suffering will most often be inconsistent in light of the record," it cannot be concluded that such a perceived inconsistency always amounts to legal error. Wainwright, 00-0492 at pp. 6-7, 774 So.2d at 75.
The Wainwright decision did not, however, go so far as to expressly abrogate the long-standing line of jurisprudence that it is legal error to award special damages for a personal injury, yet simultaneously refuse to award general damages for injuries with objective symptoms or findings. Instead, the *83 court recognized a narrow exception to that general finding of inconsistency, applicable where the evidence supports a finding that a person incurred special damages (medical expenses) but did not necessarily experience compensable pain and suffering, because the medical treatment was precautionary or to simply evaluate whether or not physical injury occurred. Wainwright, 00-0492 at pp. 10-11, 774 So.2d at 77-78.
But the case before us is simply not the type of case contemplated in Wainwright, where special damages have been incurred without attendant physical pain and suffering. In a subsequent decision, Green v. K-Mart Corp., 03-2495, p. 8 (La.5/25/04), 874 So.2d 838, 844, the Supreme Court found the jury "abused its discretion" in failing to award general damages while awarding "a substantial amount for past and future medical expenses," distinguishing Wainwright. (Emphasis supplied.) The jury here specifically found that the plaintiff suffered injuries causally related to the accident, which required medical attention and resulted in some disability and resulting loss of earnings. Therefore, as in Green, the jury's failure to award general damages together with its award for special damages constitutes an abuse of discretion, warranting a de novo review of the record and the rendering of an appropriate award by this court.
Reading Wainwright and Green together, it is clear that the supreme court was consistent in applying an "abuse of discretion" standard of review under both factual scenarios, despite the differing results in those cases. In Green, the supreme court squarely held that "[flailing to make a general damage award was an abuse of discretion," rather than legal error. Green, 03-2495 at p. 8, 874 So.2d at 844. (Emphasis supplied.) Thus, if correction of the verdict is based upon finding an abuse of discretion, rather than manifest or "legal" error, our award must necessarily be limited to raising the inadequate general damages award to the lowest amount reasonably within the jury's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977). This is because "[i]t is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." Id. (Emphasis supplied.)
We conclude that the jury's failure to award general damages in this case, as in Leighow, is subject to the "abuse of discretion" standard of review, rather than the "legal error" standard of review. We further find that the failure to award general damages was an abuse of discretion. The jury's awards of special damages for past medical expenses and past loss of earnings were too substantial to warrant the conclusion that plaintiff suffered no or inconsequential injury as the result of the accident, and it was undisputed and conclusively proven that the ankle fracture was caused by the accident. Thus, we reverse the trial court's judgment in part as to the element of general damages, and will amend the judgment in line with the Coco rule, making an appropriate award of the lowest amount reasonably within the jury's discretion, consistent with its special damages awards and the nature, duration, and effects of the ankle injury to this particular plaintiff. See Leighow, 06-0642 at p. 12, 960 So.2d at 130, and Parker v. Robinson, 05-0160, pp. 11-13 (La.App. 4th Cir.2/22/06), 925 So.2d 646, 653-54, writ denied, 06-0944 (La.9/29/06), 937 So.2d 860.
"General damages" involve mental or physical pain or suffering, inconvenience, *84 loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304, p. 7 (La.App. 1st Cir.5/5/95), 655 So.2d 431, 437.
The jury abused its discretion in failing to award damages for the related elements of past pain and suffering and past mental anguish and emotional trauma for her proven injury. "Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies [sic] an injury." McGee v. A C and S, Inc., 05-1036, p. 5 (La.7/10/06), 933 So.2d 770, 775. (Emphasis supplied.) The elements of physical pain and suffering and associated mental anguish are conceptually related and to a large extent overlapping, and therefore difficult to precisely distinguish. See Oden v. Gales, 06-0946, p. 13 (La.App. 1st Cir.3/23/07), 960 So.2d 114, 122. Accordingly, in correcting the jury's abuse of discretion, we choose to make one undifferentiated award of general damages.
The jury's awards of special damages are consistent with a finding that plaintiff sustained an ankle fracture involving a relatively brief and uncomplicated course of recovery, and that the diagnosed cervical disc injuries were not attributable to the accident. Based upon our review of the particular facts and circumstances of this case, the jury's factual findings implicit in the special damages awards, and the range of general damages awards for similar injuries, we find the appropriate total award of general damages for plaintiff's ankle injury to be $12,000.00, the lowest amount reasonably within the jury's discretion and consistent with the special damages awards.[5]
However, we cannot conclude that the jury abused its discretion with regard to the damage elements of disability and scarring. Similarly, we find no manifest or legal error as to the jury's refusal to award damages for "loss of enjoyment of life." The jury evidently concluded that the injury proven to have been sustained by plaintiff as the result of the accident (the ankle injury) did not cause her a detrimental lifestyle change warranting such an award. See McGee, 05-1036 at p. 5, 933 So.2d at 775. The record provides a reasonable evidentiary basis for the jury's decision on those elements of claimed damages.

DECREE
The trial court's judgment rendered in conformity with the jury's verdict is reversed in part and amended to award the plaintiff-appellant, Cynthia Harris, the net sum of $4,590.00, against the defendant-appellee, Delta Development Partnership, and affirmed in all other respects. The costs of this appeal are assessed to the defendant-appellee.
AFFIRMED IN PART, REVERSED IN PART, AND AMENDED.
McCLENDON, J., concurs and assigns reasons.
*85 McCLENDON, J., concurs and assigns reasons.
The majority correctly acknowledges with regard to damages that we are bound by the lowest amount reasonably within the jury's discretion. Given that Mrs. Harris' ankle injury and complaints of ankle pain were limited to approximately two and one half (2 1/2) months, I believe the appropriate award to be $8,000. Thus, I respectfully concur.
NOTES
[1] Delta's three partners were Seale, Macaluso & Ross Building Partnership, Milton R. Ballard, and John R. Ballard. Scottsdale Insurance Company was not named as a defendant, but was later substituted as defendant in place of the unknown liability insurer originally designated as "ABC Insurance Company." However, the final judgment after trial was rendered against Delta only.
[2] A subsequent, virtually identical judgment was inadvertently signed by the trial court on October 5, 2006, but has no legal effect upon the prior judgment of September 25, 2006.
[3] Although defendant's property manager, Mr. Holmes, confirmed that defendant assumed responsibility for replacement and repair of the exterior lights for each apartment, he and his wife testified that defendant relied upon each tenant to bring any such problem to the attention of the resident manager. No contrary evidence was presented to dispute that testimony.
[4] The photographs introduced into evidence were taken in daylight. One depicts a dark overnight bag on the concrete walkway near the doorway. The jury conceivably could have concluded that the dark overnight bag would still have been somewhat visible at night, given its contrast with the light tone of the concrete walkway.
[5] See, e.g., LaBorde v. St. James Place Apartments, 05-0007, p. 6 (La.App. 1st Cir.2/15/06), 928 So.2d 643, 648; Hardman v. Kroger Co., 34,250, p. 1 (La.App. 2nd Cir. 12/6/00), 775 So.2d 1093, 1094; Dawson v. Brookshire Grocery Co., 31,042, p. 3 (La.App. 2nd Cir.9/23/98), 718 So.2d 623, 625; Vigh v. State Farm Fire & Cas. Ins. Co., 97-0381, pp. 7-8 (La.App. 4th Cir. 11/19/97), 706 So.2d 480, 486.