HOLDRIDGE, J.
In this personal injury action, plaintiff, Steven McDowell, challenges the jury's allocation of 50% fault to him, the amount of the jury's past medical expense award, the jury's failure to award future medical expenses, and the jury's failure to award general damages after entering an award for past medical expenses. In this appeal and by way of supervisory writs, plaintiff challenges the trial court's denial of his motion for a new trial. For the reasons that follow, we affirm the fault allocation, the award of past medical expenses, and the denial of an award for future medical expenses. We find legal error in the jury's failure to award general damages, and upon conducting a de novo review of the record, we enter an award for general damages. Having corrected the jury's legal error in failing to award general damages, we affirm the denial of the motion for a new trial and deny the application for supervisory writs challenging that ruling.
FACTUAL AND PROCEDURAL BACKGROUND
On the morning of June 5, 2013, at approximately 6:00 a.m., Mr. McDowell was driving a 1994 GMC Sierra truck westbound on Hooper Road toward its intersection with Joor Road in East Baton Rouge Parish. Mr. McDowell's vehicle was travelling in the left lane of the two-lane highway, while Russell Diggs, Sr. was driving his 2000 Dodge 6000 truck westbound on Hooper in the outside, or right lane. The accident occurred near the end of a merge area where Hooper becomes a one-lane street for westbound traffic and vehicles in the right lane must merge into the left lane. As Mr. Diggs attempted to merge onto the main travel lane occupied by Mr. McDowell's vehicle, the left rear of Mr. Diggs' truck was struck by the right front of Mr. McDowell's truck.
On March 28, 2014, Mr. McDowell filed this lawsuit seeking damages against Mr. Diggs, his liability insurer, United Services Automobile Association (sometimes collectively referred to as "USAA"), and Liberty Mutual Insurance Company, Mr. McDowell's underinsured motorist carrier. Mr. McDowell sought to recover damages for past, present, and future physical pain and suffering, mental anguish, loss of enjoyment of life, and medical expenses. USAA disputed liability and the nature and the extent of damages allegedly suffered by Mr. McDowell as a result of the collision, maintaining that Mr. McDowell had pre-existing medical conditions which were not caused or aggravated by the accident.
The case was tried before a 12-person jury. Following the conclusion of the trial, *493 during which medical evidence was presented by both sides, the jury rendered a verdict finding that Mr. Diggs and Mr. McDowell were negligent in causing the June 5, 2013 collision. The jury allocated 50% fault to Mr. Diggs and 50% fault to Mr. McDowell. The jury then found that Mr. McDowell proved by a preponderance of the evidence that he sustained injuries as a result of the collision. When asked to itemize damages, the jury entered a single award of $8,000.00 for past medical expenses. The jury entered $0.00 in each of the blanks on the jury verdict form for future medical expenses, past pain and suffering, future pain and suffering, loss of enjoyment of life, and mental anguish/emotional distress. The jury verdict was unanimous. On December 15, 2016, the trial court signed a final judgment in accordance with the jury verdict.
Mr. McDowell filed a motion for a new trial, contending that it was legal error for the jury to award special damages without awarding damages for pain and suffering. Mr. McDowell also claimed that the medical expense award was excessively low. The trial court denied the motion for new trial.
Mr. McDowell filed an application for supervisory writs challenging the trial court's denial of his motion for a new trial. The writ application was referred to this panel. McDowell v. Diggs, 2017-0595 (La. App. 1 Cir. 7/24/17) (unpublished writ action). Mr. McDowell also appealed the December 15, 2016 judgment. In this appeal, Mr. McDowell contests: (1) the jury's allocation of 50% fault to him; (2) the jury's failure to award him the full amount of past medical expenses he incurred and its failure to award future medical expenses; (3) the jury's award of past medical expenses without an award of general damages; and (4) the trial court's failure to grant his motion for a new trial after the jury committed legal error by awarding special damages without accompanying general damages.
FAULT ALLOCATION
In his first assignment of error, Mr. McDowell contends that the jury committed manifest error in allocating 50% fault to him, insisting that the record contains no evidence that he was negligent in causing the collision. He asserts that Louisiana law places a greater burden on Mr. Diggs, as the motorist changing lanes, to demonstrate that he changed lanes only after determining that it was safe to do so, and that Mr. Diggs breached his duty to determine that it was safe to merge into Mr. McDowell's lane of travel. Mr. McDowell maintains that his knowledge of Mr. Diggs' presence in the left lane does not sufficiently establish his fault in this matter; he urges that aside from Mr. Diggs' pure assumption that he sped up before Mr. Diggs merged into the left lane, the record contains no evidence of negligence on his part. He argues that Mr. Diggs' speculation alone does not require affirmance of the jury's allocation of fault, and asks this court to reverse that allocation and amend the judgment to more accurately reflect the evidence contained in the record.
A determination of negligence or fault is a factual determination. In order to reverse a factual determination by the trier of fact, this court must find that a reasonable basis does not exist for the finding and that the record establishes that the finding is clearly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993). When factual findings are based on credibility determinations the manifest error standard of review demands great deference to the trier of fact's findings.
*494 Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. Id.
The allocation of comparative fault is also a factual determination; therefore, the trier of fact's fault allocation is owed deference by this court. Harris v. Delta Development Partnership, 2007-2418 (La. App. 1 Cir. 8/21/08), 994 So.2d 69, 74. In determining percentages of fault, the trier of fact must consider both the nature of the conduct of each party at fault and the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La. 1985). In assessing the nature of the parties' conduct, the following factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; (5) any extenuating circumstances which may require the actor to proceed in haste, without proper thought. Id.
Mr. McDowell testified that he was very familiar with the area where the accident occurred, as his mother lives nearby. He explained that Hooper is a two-lane highway which splits into four lanes at its intersection with Joor. Approximately 100 yards past the intersection, Hooper goes back to a two-lane highway, with one lane of travel in each direction. Traffic that is in the outside, or right lane of Hooper after the intersection must merge into the left lane of travel. Mr. McDowell testified that he always tries to get in the left lane of Hooper at this intersection because the right lane ends.
On the morning in question, during traffic described as "moderate," Mr. McDowell was travelling in the inside, or left lane on Hooper. He testified that he caught the red light at the intersection and that there were two vehicles in front of him and three in the right lane, with one vehicle directly on the side of him. Mr. McDowell stated that he was travelling behind another vehicle going approximately 30-40 mph; the vehicle that was beside him in the right lane crossed over Joor and then turned into a McDonalds. Mr. McDowell testified that after the vehicle in the right lane turned into McDonalds, he was paying attention to the traffic in front of him and did not see any traffic in the outside lane. According to Mr. McDowell, as he neared the area where the two lanes merged, a vehicle came "flying" around him and tried to fit into the last ten yards of space before the right lane ended and hit the side of his vehicle. Mr. McDowell insisted he would have done everything he could have to avoid the collision if possible, but it was not possible, because Mr. Diggs' vehicle came into his lane so fast and Mr. McDowell could not slow down or stop to avoid the collision. Mr. McDowell claimed he did not notice Mr. Diggs' vehicle until there was a collision between their two vehicles, and he denied having sped up his vehicle at the end of the merge area.
Mr. Diggs gave a different account of the events leading up to the collision. Mr. Diggs, who drove the same route every morning on his way to work, was also aware that after crossing Joor, the right lane of Hooper ended. Mr. Diggs testified that on the morning in question, he was in the right lane of Hooper when he caught the red light at Hooper's intersection with Joor. He stated that his vehicle was the first car in line at the red light. Mr. Diggs admitted that he saw Mr. McDowell's truck when they were at the intersection and saw Mr. McDowell's truck in his rear-view mirror when he got ready to merge.
*495 Mr. Diggs claimed that he stayed in the right lane all the way down until ten yards before it ended, and that he cleared Mr. McDowell's truck by approximately five feet before he even made an attempt to merge over. He estimated that his truck was three-quarters of the way into the left lane at the point of impact. Mr. Diggs believed that Mr. McDowell sped up his vehicle before their vehicles collided. According to Mr. Diggs, if he had been in the left lane, this accident would not have happened, because he would have allowed the vehicle merging from the right lane to come into the left lane.
Louisiana State Police Trooper Tommy Lea, who investigated the collision, arrived at the scene at approximately 7:00 a.m. At that time, the vehicles had been moved, and there was no way for Trooper Lea to determine the exact point of impact. Trooper Lea stated there were no eyewitnesses to the accident. He testified that he learned from interviews at the scene that the collision took place at the end of the merge lane as Mr. Digg tried to get into the main lane of travel occupied by Mr. McDowell's vehicle. He stated that the damage to the vehicles was consistent with what the drivers told him. According to Trooper Lea, Mr. McDowell had control of the left lane and it was incumbent on Mr. Diggs to make sure there were no vehicles in the main travel lane before merging over, and if Mr. Diggs had sufficient room or enough space to merge, the collision would not have happened. Trooper Lea acknowledged that while a motorist with the right of way such as Mr. McDowell had does not have to yield to oncoming traffic, that motorist has a duty to maintain a careful lookout and should use caution to avoid an accident if possible.
The duties of a motorist making a lane change are set forth in the law and the jurisprudence. Brewer v. J.B. Hunt Transport, Inc., 2009-1408 (La. 3/16/10), 35 So.3d 230, 241. Pursuant to La. R.S. 32:79, when a road is divided into two or more clearly marked lanes of travel, a vehicle shall be driven as nearly as practical within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety. When there is a change of lanes by a motorist immediately preceding an accident, the burden of proof is on the motorist changing lanes to show that it was first ascertained that the movement could be made safely. Brewer, 35 So.3d at 243. Under the jurisprudence, a greater burden of care is required for a motorist changing lanes than is demanded of a driver preceding at a lawful rate on a straight line in a marked lane. Id. at 241. At the same time, all motorists have a never-ceasing duty to maintain a sharp lookout and to see that which in the exercise of ordinary care should be seen. Theriot v. Bergeron, 2005-1225 (La. App. 1 Cir. 6/21/06), 939 So.2d 379, 383.
In this case, the jury concluded that the drivers bore equal fault in the ensuing collision between their vehicles. We find that determination to be reasonably supported by the record, particularly the photographs of the damage to the vehicles and the testimony of Trooper Lea, Mr. McDowell, and Mr. Diggs. The photographs show that the front of Mr. McDowell's vehicle collided with the rear of Mr. Diggs' vehicle. The jury could have concluded that Mr. Diggs was at fault in moving into Mr. McDowell's lane of travel when that lane was occupied by another vehicle and that Mr. Diggs negligently failed to yield the right of way to Mr. McDowell. The jury could also have concluded that Mr. McDowell should have seen Mr. Diggs' vehicle attempting to merge ahead of him and had he been maintaining a sharp lookout, Mr. McDowell would have had an opportunity *496 to avoid the collision by simply allowing Mr. Diggs to complete the merge into his lane of travel. The jury's fault allocation is not manifestly erroneous, and we affirm that ruling.
DAMAGES
Past and Future Medical Expenses
Mr. McDowell contends that the jury committed manifest error by not awarding him the full amount of the past medical expenses he incurred and in refusing to award any sums for future medical expenses. He submits that his medical experts and the defendant's medical experts agreed that his medical expenses were related to the collision and that he would likely require some medical treatment in the future. Mr. McDowell contends that the jury's $8,000.00 past medical expense award contradicts the testimony offered by both parties. Specifically, he points to the testimony of USAA's own experts who stated that his pre-existing degenerative conditions were exacerbated by the collision and that at least a portion of his medical treatment was related to the collision. Mr. McDowell asks this court to increase the jury's past medical expense award to $29,542.68, and to award him future medical expenses in the amount of $166,835.00.
When reviewing a jury's factual conclusions with regard to special damages, including the jury's decision to award no future medical expenses claimed by an appellant, an appellate court must engage in a two-step process based on the record as a whole. In order to disturb the jury's award of special damages or to reverse its refusal to award an element of special damages, there must be no factual basis for the jury's determination and the finding must be clearly wrong. Kaiser v. Hardin, 2006-2092 (La. 4/11/07), 953 So.2d 802, 810 (per curiam ).
At the time of the accident, Mr. McDowell was 57 years old and was working as a self-employed carpenter. He described his work as a lead carpenter as supervisory in nature, noting that he mostly did lay outs, cutting, and told others what to do. While Mr. McDowell did state that he missed days of work because of the accident, he did not ask the jury to award lost wages, and there was no detailed evidence adduced at trial of the extent of the days of work missed by Mr. McDowell due to the accident.
Regarding the collision itself, the drivers described the impact of their vehicles differently. Mr. Diggs described it as a "noticeable bump." Mr. McDowell, on the other hand, testified that the impact "slung" him to the other side of the vehicle, causing him to hit his head and shoulder on the driver's side door, and knocked him in the other lane "a little" and left him "a little" dazed. Mr. McDowell described the accident to various medical professionals as a "sideswipe" or a "t-bone" collision while travelling at a rate of 45-50 m.p.h. Mr. McDowell testified that after the accident, the front fender of his vehicle was rubbing against the tire, and that he pulled over at his mother's house, took a tire iron, and straightened it out so he could keep going. Mr. Diggs also drove his vehicle to work following the accident.
Mr. McDowell testified that after the collision, he had some pain in his neck and head, but it was not bad at that point. However, as the days progressed, his neck started hurting worse, and the pain went into his back and shoulders. Mr. McDowell stated that he had pain pills and muscle relaxers from prior doctor visits, which he took, but they did not help him. When the pain medication Mr. McDowell had been previously prescribed did not alleviate his *497 pain, he decided to seek medical treatment. Mr. McDowell contacted a lawyer, who gave him a list of doctors. From the list, Mr. McDowell chose to visit Dr. Michael Goff, a chiropractor.
During his first visit to Dr. Goff on June 24, 2013, more than two weeks after the accident, Mr. McDowell's chief complaint was neck pain; he also complained of back and left shoulder pain. Mr. McDowell denied that his major complaints existed prior to the accident. Dr. Goff's examination of Mr. McDowell's spine revealed abnormalities in all areas, Specifically, Dr. Goff found muscle spasms in Mr. McDowell's cervical, thoracic, and lumbar regions as well as in his shoulders, which, according to Dr. Goff, are objective, positive indications for some type of nerve root impingement. Dr. Goff expressed his belief that the examination results were consistent with what Mr. McDowell had told him about the way the vehicular accident occurred and what it did to Mr. McDowell's body.
The record reflects that during the first week of treatment, Mr. McDowell saw Dr. Goff five times. In July, Dr. Goff treated Mr. McDowell twelve times; in August, Mr. McDowell was treated two times, and in September, Mr. McDowell visited Dr. Goff two times. During those 21 visits, from June 24, 2013 through September 30, 2013, various physical therapy treatments were performed on Mr. McDowell, including electrical stimulation, ultrasound, cryotherapy, traction, spinal manipulation, and myofascial release. Dr. Goff felt that the treatments were keeping Mr. McDowell from having too much pain; however, Mr. McDowell remained symptomatic throughout the treatment, and Dr. Goff ordered cervical and lumbar MRIs. The MRIs, conducted on August 26, 2013, showed disc bulges and herniations along Mr. McDowell's cervical spine and bulges at virtually every level of the lumbar spine, along with an annular tear at the L4-L5 level, with no evidence of any nerve root impingement.
According to Dr. Goff, based upon his findings and what was reported on the MRIs, it was his opinion that medically, more probably than not, the 2013 collision was the reason for Mr. McDowell's symptoms and necessitated the treatment his office performed on Mr. McDowell. Dr. Goff noted that Mr. McDowell did not report prior neck problems, and felt that because there were no prior neck problems, the collision initiated Mr. McDowell's neck pain. He also felt that while Mr. McDowell did have back problems prior to the collision, the accident exacerbated or aggravated that prior back condition. Dr. Goff acknowledged that he did not have any of Mr. McDowell's prior medical records and he never contacted any other medical providers, and admitted that the history provided to him by Mr. McDowell was part of the basis for his opinion that the June 5, 2013 accident caused Mr. McDowell's pain. He also admitted that there was nothing in his records showing that he ever asked Mr. McDowell to limit his day-to-day activities.
After receiving the MRI results and believing that Mr. McDowell was in need of more than chiropractic care, Dr. Goff referred Mr. McDowell to Dr. Joseph Turnipseed, a pain management physician. Mr. McDowell first saw Dr. Turnipseed on October 17, 2013, four and a half months after the collision. At that time, Mr. McDowell's chief complaints were neck and back pain, with pain radiating down his arms with numbness down to his fingertips. Dr. Turnipseed's notes mention Mr. McDowell having prior neck and back pain; however, the doctor explained that the notation regarding prior neck pain was an error. Dr. Turnipseed testified that Mr. McDowell's *498 prior medical records indicated that Mr. McDowell had sought treatment for back pain from his primary physician once or twice a year until the year of the accident. He also stated that he did not see any evidence of complaints of neck pain in Mr. McDowell's records. Dr. Turnipseed performed a physical examination on Mr. McDowell, during which he found palpable spasms and limited range of motion along the cervical and lumbar spine. According to Dr. Turnipseed, the examination revealed that Mr. McDowell had sustained an injury limiting his range of motion, and the physical examination correlated with what the doctor saw on the MRIs and Mr. McDowell's complaints. Dr. Turnipseed diagnosed Mr. McDowell as having an annular tear of the lumbar disc, cervical and lumbar spondylosis, and herniated discs in both the cervical and lumbar area. He noted that cervical and lumbar spondylosis are basically arthritic changes which a majority of people over the age of 50 exhibit. Dr. Turnipseed testified that more than 50% of people with arthritic changes in the spine are pain-free, and noted that a trauma such as a sideswipe collision could make the arthritis become symptomatic. Dr. Turnipseed acknowledged that for someone with degenerative or arthritic conditions on their spine, the symptoms could be worsened or exacerbated permanently. According to Dr. Turnipseed, chronic pain is defined as pain after about six months; if the patient continues to experience pain after six months, it becomes less likely for those symptoms to abate or go away as you go into the future. Dr. Turnipseed expressed his opinion that more likely than not, the disc herniation and tear are subacute, that is, caused by some type of injury, and as Mr. McDowell developed pain after the motor vehicle accident, if you "put two and two together," the motor vehicle accident more likely than not caused Mr. McDowell's problems.
On November 5, 2013, Dr. Turnipseed gave Mr. McDowell a combined cervical and lumbar epidural steroid injection (ESI). Approximately seven months later, in June 2014, another round of a combined cervical and lumbar ESI was administered to Mr. McDowell by Dr. Turnipseed. In March of 2015, Mr. McDowell underwent a cervical ESI, and on November 17, 2015, another combined cervical and lumbar ESI was given to Mr. McDowell by Dr. Turnipseed. Finally, in 2016, Dr. Turnipseed gave Mr. McDowell had a combined neck and back ESI. (R458) Dr. Turnipseed testified that the ESIs were medically necessary, as Mr. McDowell failed at conservative therapy, had tried pain medications, anti-inflammatories, and muscle relaxers, and while Mr. McDowell may be a surgical candidate, he had elected to choose interventional treatment to potentially avoid surgery and to improve his pain and function.
Dr. Turnipseed testified that Mr. McDowell had responded effectively to all of the procedures and that the injections were effective in providing Mr. McDowell pain relief. He indicated that as long as they were providing Mr. McDowell with pain relief for at least three months, he would continue to give ESIs to Mr. McDowell. Dr. Turnipseed estimated that he could provide Mr. McDowell with pain relief for up to ten years at approximately the same cost and pattern similar to that he had provided to Mr. McDowell over the three years he had treated Mr. McDowell. Dr. Turnipseed acknowledged that Mr. McDowell has reached maximum medical improvement and will not get better than he was at the time of trial.
On cross-examination, Dr. Turnipseed admitted that Mr. McDowell did not bring any medical records detailing his prior treatment before the accident and that he was provided with medical records of prior treatment the day before he testified at *499 the trial. He also stated that the first time he prescribed any medication to Mr. McDowell was in May of 2014, when he prescribed a muscle relaxer and an anti-inflammatory. Dr. Turnipseed testified that based on the history Mr. McDowell gave him, he believed the accident caused Mr. McDowell's pain for which he first saw Mr. McDowell in October of 2013. Dr. Turnipseed acknowledged that if that history was not correct, he would be unable to relate all of Mr. McDowell's past and future treatment to the vehicular accident. However, he opined that Mr. McDowell was injured in the vehicular accident and aggravated a pre-existing condition.
Dr. Thad Broussard, an orthopedic surgeon who performed an examination on Mr. McDowell at the request of the defense, was asked to offer his opinion as to what the MRI films showed, Dr. Turnipseed's opinion that Mr. McDowell will need ESIs for the rest of his life, causation as to Mr. McDowell's neck and back complaints, and whether Mr. McDowell is physically restricted from working as a result of the accident. Dr. Broussard, an expert in the field of orthopedic surgery, examined Mr. McDowell on June 9, 2015. At that time, Mr. McDowell reported that he was in pain every day and that the ESIs had given him periods of relief. Mr. McDowell also reported that his pain was aggravated by the amount of physical activity he was doing, but that he had no interest in giving up his job or in having back surgery. According to Dr. Broussard, Mr. McDowell's spinal examination results were all normal. Dr. Broussard testified that Mr. McDowell's MRI findings were degenerative in nature, and showed multilevel degenerative spondylotic changes which he described as global degenerative changes or "normal wear and tear" changes. Dr. Broussard stated that the findings documented on the MRI were not traumatic type injuries and that Mr. McDowell had spinal problems before the accident. He opined that the accident probably aggravated Mr. McDowell's spinal problems based on the history Mr. McDowell provided to him and the medical records Dr. Broussard reviewed. When asked what would be a reasonable time frame for Mr. McDowell to have suffered an aggravation of his neck and back problems after the accident, Dr. Broussard replied that was a difficult question, and one he could not answer, only having seen Mr. McDowell one time. Dr. Broussard believed that Mr. McDowell had some neck and back pain which, based upon Mr. McDowell's history, was consistent with the findings on the imaging studies.
Dr. Broussard opined that ESIs were not indicated in Mr. McDowell's case. In Dr. Broussard's opinion, ESIs were not indicated for back and neck pain alone, but must be supported by objective physical findings that correlate positively with an imaging study. In short, he testified, ESIs were indicated only for back or neck pain associated with objective findings of radiculopathy, or radiating leg or arm pain. However, Mr. McDowell did not have any objective radicular findings and did not even have any subjective radicular findings. Dr. Broussard did not feel that Mr. McDowell was a surgical candidate and believed that further orthopedic treatment is not indicated. Dr. Broussard described Mr. McDowell as a "high functioning individual" who is building houses and working every day, is not taking narcotics, and except for his subjective complaints of pain, had no objective findings to support them.
Dr. Sandra Weitz, a pain management specialist, was hired by the defense to render an opinion regarding the extent of treatment provided to Mr. McDowell relative to the vehicular accident and to offer an opinion regarding future medical treatment.
*500 On August 25, 2015, Dr. Weitz conducted an independent medical examination on Mr. McDowell and reviewed the August 26, 2013 MRIs and Dr. Turnipseed's notes. According to Dr. Weitz, Mr. McDowell reported that he had a history of back pain prior to the accident that was not really significant and did not experience neck pain before the accident. However, after the accident, he started having back and neck pain with pain radiating down his arms. Mr. McDowell told Dr. Weitz that he had injections in his neck and following those injections, his neck pain was basically gone; however, his ongoing complaint was really his low back, for which he had pain radiating into his buttocks. Mr. McDowell also reported pain in his hands and knees and that he was remodeling a house. Dr. Weitz acknowledged that Dr. Turnipseed's notes indicated that Mr. McDowell had reported intermittent neck and back pain before the accident.
In reviewing Mr. McDowell's MRIs, Dr. Weitz denied that there was anything in those reports she believed was likely caused by the June 5, 2013 motor vehicular accident. According to Dr. Weitz, the MRI reports indicate that Mr. McDowell had pre-existing widespread significant degenerative disc disease pretty much at every level of the cervical and lumbar spine. She opined that Mr. McDowell's complaints of neck and back pain after the accident represented exacerbations of his pre-existing degenerative disc disease. When asked what treatment she believed was more likely than not related to the June 5, 2013 accident, Dr. Weitz answered that obviously the MRIs were reasonable. She also opined that one or two of the ESIs in the cervical spine and the first lumbar ESI were related to the accident. Specifically, Dr. Weitz related the ESIs in Mr. McDowell's neck and back on November 5, 2013, to the accident based on Mr. McDowell's report that he was not getting significant treatment for his neck or low back pain prior to the accident.
However, Dr. Weitz stated that it became harder to relate Mr. McDowell's later ESIs and his complaints of pain following those ESIs to the accident more probably than not because there was a history of waxing and waning pain predating the accident, and the kind of work Mr. McDowell was doing could cause intermittent flare-ups and exacerbate Mr. McDowell's neck and low back pain. She also stated that the fact that Mr. McDowell reported that he was better after the injection and then had symptoms again made it hard to relate the later ESIs specifically to the accident. She also acknowledged it would be difficult to say, more probably than not, that the accident, rather than Mr. McDowell's daily living, was responsible for the later ESIs. Dr. Weitz believed Mr. McDowell's job as a carpenter could currently result in his ongoing symptoms. Dr. Weitz acknowledged that her opinion that the first injections on November 5, 2013 were related to the accident is based solely on the history provided to her by Mr. McDowell, and opined more probable than not that Mr. McDowell would have needed an ESI for his back regardless of whether this accident occurred and would more probably than not have needed an ESI in his neck regardless of the accident.
With respect to future care, Dr. Weitz believed it was reasonable to repeat Mr. McDowell's ESIs as long as he continued to get more than 50% relief from each injection, but she was unable to relate this treatment to the accident. She disagreed with the frequency of the injections as recommended by Dr. Turnipseed. Dr. Weitz did not see the need for Mr. McDowell to have physical therapy, surgical intervention, or medication in the future. Dr. Weitz responded "clearly no" when asked *501 if there was any pain management modality she could see Mr. McDowell needing more probably than not in the future.
Dr. Weitz agreed that Mr. McDowell did suffer neck and back pain after the accident and that there was a period of exacerbation of his pre-existing degenerative disc disease following the accident. However, she plainly disagreed that all of the care rendered to Mr. McDowell by Dr. Turnipseed is related to the motor vehicle accident, noting that Mr. McDowell's pain was not in fact dormant prior to the accident because he had reported neck and back pain to his treating physicians prior to the accident. She testified that the pain Mr. McDowell reported to her is consistent with having degenerative, arthritic changes throughout his body, and one would expect someone who was in Mr. McDowell's profession of building and remodeling houses requiring that he perform heavy manual labor to have pain generalized over his body.
Dr. Turnipseed testified that he did not agree with Dr. Broussard's opinion that future ESIs are not indicated as Mr. McDowell's pain improved or was alleviated over a period of time with the injections. He maintained that if he took the injections away, he would be unable to find that Mr. McDowell had reached his pre-injury baseline. He also disagreed with Dr. Weitz's opinion that Mr. McDowell's ongoing problems are not the result of his accident but probably are the result of Mr. McDowell's job, stating that he disagreed with Dr. Weitz's position that Mr. McDowell was performing a heavy duty job and characterized Mr. McDowell's senior carpenter job as "light duty." Dr. Broussard disagreed with Dr. Weitz's opinion that ESIs were indicated in Mr. McDowell's case.
After examining all of the medical evidence in this case, it is apparent that there were conflicting opinions regarding the nature, duration, and causation of Mr. McDowell's claimed injuries. The jury was required to base its past medical award on Mr. McDowell's credibility, the accuracy of his reporting of his underlying history, and the conflicting findings of the expert witnesses as to what treatment was related to the automobile accident. In light of the medical testimony and the medical expense summary offered into evidence outlining Mr. McDowell's treatment, it appears that the jury awarded Mr. McDowell the cost of Dr. Goff s treatment from June 24, 2013 through September 30, 2013, including the cost of the cervical and lumbar MRIs, and some, but not all, of the cost of Dr. Turnipseed's treatment. This award is entirely consistent with the testimony of Dr. Weitz, who attributed Mr. McDowell's medical treatment through the November 5, 2013 ESIs to the accident. Thus, we find that there is a reasonable factual basis for the jury's determination that only part of the medical expenses claimed by Mr. McDowell were attributable to the June 5, 2013 accident, and the jury was not clearly wrong in choosing to award Mr. McDowell less than the full amount of the claimed medical expenses.
Furthermore, the record reasonably supports the jury's refusal to award future medical expenses to Mr. McDowell. The evidence was clearly conflicting over whether any future treatment was even indicated in Mr. McDowell's case and conflicting evidence as to whether any future treatment could be reasonably related to the accident. The jury's choice between the conflicting opinions is not manifestly erroneous, and we decline to disturb its ruling.
General Damages
In his third assignment of error, Mr. McDowell asserts that the jury erred *502 in awarding special damages without accompanying general damages. We agree.
Under La. C.C. art. 2324.1, a jury has much discretion in the assessment of general damages. However, when a jury awards special damages but declines to award general damages, a reviewing court must first determine whether the jury's finding is so inconsistent as to constitute an abuse of its much discretion. Green v. K-Mart Corporation, 2003-2495 (La. 5/25/04), 874 So.2d 838, 843-44. A trier of fact abuses its discretion in failing to award general damages where it finds that a plaintiff has suffered injuries causally related the accident that required medical attention. Id.
In this case, the jury specifically found that Mr. McDowell suffered injuries causally related to the accident that required medical treatment. The jury's failure to award general damages together with its award for special damages, given the circumstances of this case, is so inconsistent that it constitutes an abuse of discretion, warranting a de novo review of the record and the rendering of an appropriate award by this court. See Harris, 994 So.2d at 83. Because we have found legal error interdicting the damage-determining process, we shall make a de novo determination of damages. See Thibodeaux v. Donnell, 2016-0570 (La. 1/20/17), 219 So.3d 274, 279.
General damages involve mental or physical pain or suffering, inconvenience, loss of enjoyment of life, or other losses of lifestyle that cannot be measured definitively in terms of money. The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Harris, 994 So.2d at 83-84. Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury. McGee v. A C and S, Inc., 2005-1036 (La. 7/10/06), 933 So.2d 770, 775. In correcting the error in failing to award general damages, we choose to make one undifferentiated award to Mr. McDowell for pain and suffering. See McLin v. McNabb, 2016-0449 (La. App. 1 Cir. 12/22/16), 2016 WL 7407384 (unpublished opinion).
The record demonstrates that Mr. McDowell sustained an exacerbation of his pre-existing degenerative disc disease as a result of the June 5, 2013 accident. He was treated 21 times for neck and back pain by a chiropractor from June 24, 2013 through September 30, 2013, and received treatment from Dr. Turnipseed thereafter, including ESIs on November 5, 2013 for his back and neck pain, all of which was related to the vehicular accident by USAA's own independent medical examiner. Further, it appears that Mr. McDowell had some lingering pain and suffering for a period of time thereafter which would be causally related to the accident. Based on all of the circumstances of this case, we conclude that a general damage award of $25,000.00 is consistent with the jury's $8,000.00 special damage award and the nature, duration, and effects of Mr. McDowell's injuries that are causally related to the accident. Accordingly, we render judgment awarding Mr. McDowell $25,000.00 in general damages.
Because we have corrected the jury's error in failing to award general damages, it is unnecessary for this court to address Mr. McDowell's assignment of error challenging the trial court's denial of his motion for a new trial based on the jury's failure to award general damages. For this same reason, Mr. McDowell's application for supervisory writs challenging the trial court's denial of his motion for a new trial is denied.
*503 CONCLUSION
For the foregoing reasons, we affirm those portions of the judgment allocating fault 50% to each driver and awarding Mr. McDowell past medical expenses in the amount of $8,000.00. We reverse the jury's failure to award general damages and enter an award in favor of Steven McDowell and against Russell Diggs and United Sendees Automobile Association in the amount of $25,000.00. Steven McDowell's application for a supervisory writ is hereby denied. All costs of this appeal are assessed equally to the parties.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED; WRIT DENIED.
Higginbotham, J. concurs with the result.