NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2025 CA 0059

DEMETRIS LAWSON

VERSUS

RANDEN GAUTREAU, JOHNSON CONTROLS FIRE PROTECTION, LP,
AND OLD REPUBLIC INSURANCE COMPANY

Judgment Rendered: _____NOV 0 7 2025_____

\*\*\*\*\*\*\*\*

Appealed from the Twenty-First Judicial District Court
In and for the Parish of St. Helena
State of Louisiana
Case No. 24075
Honorable Charlotte H. Foster, Judge Presiding

\*\*\*\*\*\*\*\*

Don R. Williams
Baton Rouge, Louisiana

Counsel for Plaintiff/Appellant
Demetris Lawson


Arthur Landry
New Orleans, Louisiana
-and-
David Forkner, *pro hac vice*
Bradley Deutchman, *pro hac vice*
Washington, DC

Counsel for Defendants/Appellees
Randen Gautreaux and Johnson
Controls Fire Protection, LP


\*\*\*\*\*\*\*\*

BEFORE: LANIER, WOLFE AND HESTER, JJ.

**LANIER, J.**

In this suit by the plaintiff/appellant, Demetris Lawson, against the defendants/appellees, Randen Gautreau and Johnson Controls Fire Protection, LP (Johnson Controls), the Twenty-First Judicial District Court rendered judgment in favor of Ms. Lawson pursuant to a jury verdict, awarding Ms. Lawson $1,150.00 against the defendants/appellees. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On August 20, 2018, Ms. Lawson was involved in an automobile accident, with the other vehicle being driven by Mr. Gautreau, in St. Helena Parish. Mr. Gautreau, traveling in a van westbound on La. 16, drifted across the center line and into the eastbound lane, and then collided with an 18-wheeler, in which Ms. Lawson was a passenger. Ms. Lawson allegedly sustained both property damage and personal injury. At the time of the accident, Mr. Gautreau was acting within the course and scope of his employment with Johnson Controls. Mr. Gautreau and Johnson Controls were insured by Old Republic Insurance Company (Old Republic).

In her petition for damages, Ms. Lawson claimed she suffered the following: past, present, and future medical expenses; past, present, and future physical pain and suffering; past, present, and future mental anguish; past, present, and future emotional distress; past, present, and future loss of enjoyment of life; past, present, and future lost wages; loss of future earning capacity; and any and all other damages that could be proven at trial. Ms. Lawson estimated that her damages exceeded $50,000.00.

On April 5, 2021, the parties filed a joint stipulation, in which the defendants admitted liability for the accident, that Mr. Gautreau was acting in the course and scope of his employment with Johnson Controls at the time of the accident, and that Mr. Gautreau and Johnson Controls were insured by Old Republic at the time

2

of the accident. The parties proceeded to trial on the issue of quantum for Ms. Lawson's injuries.

A trial by jury in the matter commenced on March 6, 2023, and concluded on March 10, 2023. The jury verdict form read as follows:

1. Do you find by a preponderance of evidence that Demetris Lawson suffered any injuries or aggravation of any pre-existing injuries as result of the accident that occurred on August 20, 2018? [Answer is "Yes"]

2. What amount of damages, expressed in dollars, will reasonably and adequately compensate Demetris Lawson for the injuries suffered as a result of the accident that occurred on August 20, 2018?
   Physical Pain and Suffering, Past & Future .............. $1,150.00
   Mental Anguish and Emotional Distress,
   Past & Future ............................................. $0.00
   Loss of enjoyment of Life, Past & Future ................ $0.00
   **TOTAL:**                                              **$1,150.00**

The trial court polled the jury, and the polling revealed that ten of the twelve jurors agreed with the verdict. The trial court found the verdict to be correct and in appropriate form, and adopted the verdict as its judgment. The trial court signed the judgment on April 4, 2023.

Ms. Lawson filed a motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial, on April 13, 2023. Ms. Lawson argued that no reasonable jury could have reached the jury's verdict based on the evidence presented at trial, that her award was abusively low, that the facts pointed so strongly and overwhelmingly in her favor for a higher award, and that the jury's verdict was unreasonable. The trial court denied the motion. Ms. Lawson has appealed the April 4, 2023 judgment.[1]

---

[1] The motion for devolutive appeal names Demetris Lawson and her husband Trevor Lawson as plaintiffs; however, Mr. Lawson's claims were apparently dismissed in a separate matter prior to the filing of the instant appeal. Mr. Lawson is not a party to this appeal.

## ASSIGNMENT OF ERROR

Ms. Lawson argues that the jury abused its discretion and/or committed manifest error in awarding only $1,150.00 in general damages for past and future physical pain and suffering, nothing for past and future mental anguish and emotional distress, and nothing for past and future loss of enjoyment of life. She further argues that the jury's general damages awards should be increased to a reasonable amount.

## STANDARD OF REVIEW

A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La. 1993). This court has announced a two-part test for the reversal of a factfinder's determinations: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Id.*

## DISCUSSION

At trial, testimony of various witnesses was introduced into evidence, some live and some by video deposition. The following are summations of those testimonies as they pertain to Ms. Lawson's injuries.[2]

---

[2] A number of video depositions and documents, all admitted as evidence at trial, were not included with the appellate record that is before us. After the instant appeal was lodged with this court, Ms. Lawson filed a number of motions for extensions of time to file her brief and to supplement the appellate record from February to May of 2025, due to these evidentiary items not being included in the record. On March 21, 2025, this court denied Ms. Lawson's second

4

*Amanda Easley, APRN*

Amanda Easley, a nurse practitioner for an occupational clinic, is qualified to conduct physical examinations on behalf of the United States Department of Transportation (DOT). Nurse Easley performed such an examination on Ms. Lawson on June 13, 2018, approximately two months prior to the accident. Nurse Easley noted that at the time of the examination, Ms. Lawson reported having hypertension, high cholesterol, and history of a broken leg in 2007.

Nurse Easley testified that in order to have a commercial driver's license, the DOT allows a driver to have high blood pressure and high cholesterol, so long as those conditions remain under control. Ms. Lawson was taking medication to keep her cholesterol level and blood pressure controlled. Nurse Easley also stated that although Ms. Lawson took diabetes medication, there was no evidence of glucose in her bloodstream. Ms. Lawson was able to complete the climbing, squatting, and bending tests. Nurse Easley testified that Ms. Lawson passed the DOT physical and gained certification for a commercial driver's license on June 13, 2018.

On cross-examination, defense counsel showed to Nurse Easley Ms. Lawson's record of admission to Our Lady of the Lake Hospital (OLOL), dated July 9, 2009. The record indicated that Ms. Lawson's chief complaint upon being admitted to the hospital was "chest pain," and a diagnosis of "chest pain" and "anxiety." Nurse Easley responded that those were conditions she asked Ms. Lawson about during the DOT physical, which Ms. Lawson did not state that she had. In another admission record from OLOL, dated December 23 to 24, 2010, Ms. Lawson presented with "chest pain and shortness of breath." Ms. Lawson was

---

motion to supplement the record on appeal, ruling that "[a] request to supplement the appellate record is more properly directed to the district court. See [La. C.C.P.] arts. 2132 & 2088(A)(4)." As of the rendering of this opinion, this court has not received any supplementation of the record from the district court.

diagnosed with acute chest pain, acute dyspnea, and acute back pain, conditions that were not disclosed to Nurse Easley during the DOT examination.

Further, in another admission to OLOL from August 28, 2011, Ms. Lawson presented with "non-productive cough" and "shortness of breath." The record also indicated that Ms. Lawson had a nebulizer to treat asthma. Ms. Lawson was diagnosed with cough, asthma, and acute asthma exacerbation. These conditions were not disclosed by Ms. Lawson to Nurse Easley at the DOT examination. In another admission record of August 30, 2011, Ms. Lawson complained of "palpitations... heart fluttering onset one hour ago, feels faint, short of breath and nauseated." She was diagnosed with acute heart palpitation, anxiety, acute dyspnea, and dizziness, but did not disclose these conditions to Nurse Easley at the DOT examination.

During another admission to OLOL on April 2, 2012, Ms. Lawson again complained of palpitations, chest pain, and headache due to stress. Ms. Lawson was diagnosed with anxiety disorder, but Nurse Easley was not informed by Ms. Lawson of these conditions at the DOT examination. In an admission record to LSU Health on June 28, 2013, Ms. Lawson complained of shortness of breath and presented a history of type 2 diabetes, which is an ongoing condition. In another OLOL admission dated April 27, 2014, Ms. Lawson's chief complaint was chest pain and shortness of breath, and in another OLOL admission from August 13, 2014, Ms. Lawson was diagnosed with acute cervical radioculopathy (neck pain), arm pain, and shoulder sprain. Nurse Easley was not told of any of these conditions at the DOT examination.

Finally, in a OLOL admission record of August 28, 2015, Ms. Lawson reported a history of a motor vehicle accident. Her diagnosis on that date was back sprain, cervical sprain, and head injury. These conditions were not disclosed to Nurse Easley at the DOT examination.

*Sgt. Kenneth Giacone*

Sergeant Kenneth Giacone of the Louisiana State Police investigated the scene of the accident on August 20, 2018. He stated that he arrived on the scene about ten minutes after the accident occurred, and, based on his experience as a crash scene investigator, determined the van driven by Mr. Gautreau had come to a controlled stop, which was approximately a tenth of a mile in distance. Sgt. Giacone did not note any risk of rupture of the gas tanks on the 18-wheeler, of which Ms. Lawson was a passenger. (

*Kendra Williams*

Kendra Williams, a licensed professional counselor, first met with Ms. Lawson on July 17, 2019. Ms. Lawson reported to Ms. Williams severe anxiety, sleep disturbances, depressed mood, and intrusive thoughts. Ms. Lawson also told Ms. Williams that she was in a lot of physical pain, which was causing her emotional distress and interfered with her sleep. Ms. Lawson told Ms. Williams that she began experiencing these symptoms "since the time of her injury." Ms. Lawson described the event of this "injury" as "hit on the back of a truck." Ms. Williams stated that she met with Ms. Lawson for an hour a total of six times between the initial visit and January 30, 2020.

*Nadia Ebanks*

Nadia Ebanks, a licensed clinical social worker and board approved clinical supervisor, who was accepted by the trial court as an expert on social work, met with Ms. Lawson on June 8, 2019, after Ms. Lawson reported experiencing anxiety due to a car accident. Ms. Ebanks referred Ms. Lawson to Dr. Chandra Katta, a psychiatrist, while witnessing Ms. Lawson become hysterical after discussing the accident. Ms. Lawson stated to Ms. Ebanks that she felt she was "near death" during the accident, and began to panic and hyperventilate as she related the details of the accident. Ms. Lawson exhibited the same behavior to Ms. Ebanks on

7

follow-up visits. Ms. Ebanks stated that Ms. Lawson did not share any prior psychiatric history with her, but reported having hypertension, asthma, and high cholesterol.

Ms. Ebanks was present in the courtroom when Nurse Easley testified, and she testified that Ms. Lawson did not make her aware of her prior hospitalizations, although it is rare for a client to provide medical records to her. Ms. Lawson detailed her physical injuries from the accident to Ms. Ebanks. Ms. Lawson claimed she had bruises, cuts to the neck, back injuries, buttocks injuries, an injury to her left arm, and a knee and muscle injury to her right leg. Ms. Lawson also told Ms. Ebanks that she was disabled and at the time unable to work.

*Chandra Katta, M.D.*

Dr. Katta, accepted by the trial court as an expert in psychiatry, examined Ms. Lawson on June 8, 2019, almost one year after the accident, for her physical and mental injuries. She diagnosed Ms. Lawson with post-traumatic stress disorder (PTSD). Dr. Katta was aware of Ms. Lawson's August 20, 2018 accident at the time of her examination. Ms. Lawson reported to Dr. Katta reoccurring flashbacks and nightmares of the accident, which resulted in panic attacks, depression, problems with sleep, and pain. Ms. Lawson also exhibited startled reflexes, irritability, crying spells, and meltdowns, all progressing from the time of the accident. Dr. Katta testified that it was more probable than not that these symptoms stemmed from the August 20, 2018 accident. Based on the diagnosis, Dr. Katta prescribed to Ms. Lawson Xanax for anxiety and Trazadone for sleep.

On cross-examination, Dr. Katta testified that she met with Ms. Lawson four or five times. In all of her visits, Ms. Lawson did not provide to Dr. Katta any records of her prior mental health history, but Dr. Katta was made aware that Ms. Lawson had never before received psychiatric treatment. Dr. Katta was in the courtroom when Nurse Easley testified, and she heard the multiple diagnoses that

8

Ms. Lawson received from the hospitals she visited, including anxiety, and Dr. Katta testified that those diagnoses were not revealed to her by Ms. Lawson.

*Meredith Warner, M.D.*

Dr. Warner, accepted by the trial court as an expert in orthopedic surgery, was retained by the defendants to personally evaluate Ms. Lawson. She received medical records of Ms. Lawson in connection with the evaluation. Dr. Warner attempted in her evaluation to locate sources of pain on Ms. Lawson, but Ms. Lawson appeared to have total body pain, and locating sources of pain proved to be difficult. Dr. Warner testified that many of the conditions that Ms. Lawson had prior to the August 20, 2018 accident, including obesity and her age, were contributing factors to her pain.

Dr. Warner stated that in her evaluation of Ms. Warner, she could find no objective evidence of an actual injury stemming from the accident; in other words, she found no evidence of broken bones, dislocated joints, torn ligaments or muscle, etc. However, she did find evidence of preexisting joint derangement, which was consistent with the degenerative conditions found in Ms. Lawson's medical records.

In reviewing Ms. Lawson's medical records from her treatment on the day of the accident, Dr. Warner did not find any evidence of fractures or dislocations, but did see evidence of an abrasion or laceration on the right knee, which was treated on that day in the emergency room. X-rays of Ms. Lawson on the day of the accident did not indicate any abnormalities. Dr. Warner concluded that Ms. Lawson's knee pain was consistent with preexisting degenerative conditions in her knees. Dr. Warner also concluded that Ms. Lawson's back pain was consistent with preexisting degenerative conditions in her spine.

Dr. Warner testified that she did not believe that any orthopedic surgery or invasive pain treatments would satisfactorily address Ms. Lawson's complaints of

pain. This was largely due to testing done on Ms. Lawson on the day of her accident, when no specific sources of pain could be found on her. Dr. Warner concluded that the procedures that Ms. Lawson underwent to treat her symptoms of pain could not be attributed to the August 20, 2018 accident.

From reviewing Ms. Lawson's medical records, Dr. Warner found evidence of conditions that could contribute to ongoing pain issues for Ms. Lawson: ulcer pains in Ms. Lawson from April 6, 2007; knee, foot, leg and back pain after a slip on May 31, 2008; ankle pain after a fall on October 25, 2008; acute low back pain, ankle sprain on March 7, 2011; arm and neck pain, numbness in fingers, and complaints of severe myalgia on July 6, 2014; and neck pain in February of 2015. From an MRI of July 9, 2011, a vertebral tear was discovered in the L4-5 area of Ms. Lawson's spine. Dr. Warner stated that the tear was the result of the disc's degeneration.

Dr. Warner also discovered from the medical records that Ms. Lawson had been in a motor vehicle accident on August 28, 2015, the same record that was shown to Nurse Easley, where Ms. Lawson complained of shoulder, hip, neck and low back pain. There was also a complaint on September 1, 2015 of hip pain persisting from the August 28, 2015 accident and another complaint on September 23, 2015 of pain persisting from that accident. On March 6, 2017, Ms. Lawson was diagnosed with a foot fracture after dropping a water bottle on her foot. Ms. Lawson reported lumbar tenderness, headaches, and low back pain in January of 2018. Her next medical history was the August 20, 2018 accident. Dr. Warner concluded that Ms. Lawson had a number of preexisting complaints of pain in different parts of her body prior to the August 20, 2018 accident, and that it was not medically probable that her complaints were caused by that accident.

On cross-examination, Dr. Warner agreed that for about eight months prior to the accident, Ms. Lawson did not present with neck pain or low back pain, or

10

right knee pain. Dr. Warner also agreed that a broken bone, dislocation, or a torn ligament is not necessary to conduct any kind of pain treatment.

*Antonio Williams*

Antonio Williams, a neighbor of the Lawsons for almost twenty years and very familiar with them, stated that prior to the August 20, 2018 accident, Ms. Lawson would often take walks in the neighborhood and actively play with her grandchildren. Mr. Williams testified that after the accident, he did not see Ms. Lawson go outside as often as he used to. Ms. Lawson would no longer take walks around the neighborhood or play with her grandchildren. Mr. Williams testified that Ms. Lawson walked differently since the accident, "like she's cripple[d]." He had seen Ms. Lawson walk with difficulty for about five years prior to trial, and she would need help out of her car. When Mr. Williams would help Ms. Lawson out of her car, he would see her crying. Mr. Lawson would then help Ms. Lawson walk into their house.

On cross-examination, Mr. Williams stated that although he is familiar with the Lawsons, he does not socialize with them. He was not sure when the car accident at issue in this case occurred and had no details of it. Mr. Williams also stated that he is not aware of Ms. Lawson's medical conditions and does not know the reason for Ms. Lawson's decline in health.

*Joyce Beckwith*

Joyce Beckwith, a licensed and certified vocational rehabilitation counselor, was retained by Ms. Lawson to do a vocational assessment. Ms. Beckwith conducted an interview by telephone with Ms. Lawson on October 30, 2019, and reviewed Ms. Lawson's medical history. She testified that Ms. Lawson told her that although she had a bachelor's degree in social work, she was not employed as a social worker and at the time of the accident, she was nearing graduation from Diesel Driving Academy. Ms. Beckwith stated that after interviewing Ms. Lawson

11

and reviewing her medical history, she was not physically qualified for a position in the truck driving industry.

Ms. Beckwith stated that tractor-trailer drivers in the Baton Rouge area earn from $11.21 to $30.23 per hour. However, due to her health conditions, Ms. Lawson would only qualify for minimum wage-level employment, which was approximately $10.00 to $13.00 per hour, despite her bachelor's degree. Moreover, Ms. Beckwith testified that while Ms. Lawson was undergoing medical treatment, she was not capable of working.

On cross-examination, Ms. Beckwith stated that she only reviewed Ms. Lawson's medical history post-accident, and was not aware if she had reviewed any history from before the accident. She further stated that the only way she could know of Ms. Lawson's medical history from before the accident would be if Ms. Lawson had told her about it, which Ms. Lawson did not do. Ms. Beckwith had no knowledge of Ms. Lawson having a history of recurring back pain or knee pain, or neck pain.

*Demetris Lawson*

Ms. Lawson stated that she received a bachelor's degree in social work from Southern University in 2016, and that she had attended Diesel Driving Academy to obtain a commercial driver's license just prior to the August 20, 2018 accident, but did not graduate due to the accident. She stated that prior to the accident, she would exercise and walk around her neighborhood. Ms. Lawson would also play with her grandson. She also cooked, cleaned, shopped, and traveled. Ms. Lawson also stated that at the time she took the DOT physical examination with Nurse Easley, she had high blood pressure and cholesterol, asthma, and insulin resistance, and gave her a list of all medications she was taking at the time. She did not experience any physical pain while doing the bending, squatting, and toe touching portions of the examination, but she stated that as of the day of trial, she could not

12

perform those movements without experiencing pain and stability issues. Ms. Lawson stated that prior to the August 20, 2018 accident, she did not have pain issues with her neck, lower back, or knee.

Ms. Lawson stated that on August 20, 2018, she was the passenger in an 18-wheeler that was driven by a fellow Diesel Driving Academy student. Ms. Lawson was seated behind the driver. She could see Mr. Gautreau's vehicle approaching and braced for impact. Upon impact, Ms. Lawson testified she was ejected from her seat and hit her head, rendering her unconscious. There was no seatbelt for Ms. Lawson to wear in her seat. She testified the truck she was in was driving at about 40 to 45 miles per hour at impact. Upon regaining consciousness, Ms. Lawson claimed that she experienced "terrible pain" in her knee, neck, and back. Ms. Lawson claimed to have seen smoke coming from the location of the truck's gas tank. Ms. Lawson needed assistance to exit the truck and move away from it. At trial, Ms. Lawson wept upon being shown a photograph of the crash scene.

Ms. Lawson stated she received "minimal treatment" at the emergency room of Hood Memorial Hospital, where she stayed from mid-afternoon to the evening of August 20, 2018. She then went from Hood to OLOL because she thought she could get better care. She returned to her home the next morning. While at home, Ms. Lawson was confined to her bed and sedated due to her pain. Ms. Lawson testified she received injections for her pain, and they gave her some relief, enabling her to get out of bed and walk around her house. Due to her pain, Ms. Lawson had trouble sleeping up until the day of the trial.

Ms. Lawson also underwent conservative physical therapy for her back, and she received medication for headaches. She also received physical therapy for her knee, but needed the aid of a walker. She also received a debridement for her knee. After receiving more injections for pain, Ms. Lawson was eventually able to walk outside, and eventually around her block. However, since the accident, her

13

walks are much shorter and less frequent, and she no longer exercises. She is no longer able to play with her grandson, although she still takes care of him. Standing for too long is also painful to Ms. Lawson, and if she bends, she has difficulty getting back up.

Ms. Lawson testified that since the accident, her sex life with her husband has diminished due to her physical pain. Mr. Lawson often has to help her do simple physical tasks and chores that she used to do on her own. She testified that since the accident, she has a fear of 18-wheelers, and is fearful whenever one drives near or past her. She had psychological treatment and mental health counseling after being diagnosed with anxiety and PTSD. Ms. Lawson did not drive for a couple of years after the accident due to her fear, but she has resumed driving. She stated that she has also been diagnosed with depression since the accident due to a lack of energy, will to get out of bed, and desire to be social.

On cross-examination, Ms. Lawson acknowledged that the discharge notes she received from Hood Memorial Hospital from the day of the accident indicated that she was discharged in good condition, although she left in a wheelchair. She also acknowledged that the CT scan result of her head from OLOL indicated "no acute intracranial abnormality seen," and that her MRI results indicated "normal MRI examination of the brain." She also admitted that she presented with head and back pain after her 2015 car accident. A CT scan from that time also indicated "normal." Ms. Lawson further admitted that although she claimed she had no head issues during her DOT examination, she presented on four separate occasions prior to the August 20, 2018 accident with head pain.

Ms. Lawson acknowledged that in 2014, she had a CT scan of her neck, and the results indicated "normal," although she had presented with severe neck pain. She presented with severe neck pain after the 2015 accident as well. The CT scan indicated spondylosis, or degeneration of the spine, in her neck. She again

14

complained of neck pain in January of 2018. Despite her previous complaints of neck pain, Ms. Lawson acknowledged that she denied having neck pain at her DOT examination. Ms. Lawson acknowledged she injured her back in 1990, resulting in chronic back pain. She admitted being diagnosed with spinal degeneration in her back in 2011. Ms. Lawson admitted to not disclosing any of her back issues during her DOT examination.

Ms. Lawson acknowledged that when she went to OLOL after the August 20, 2018 accident, the x-rays of her back indicated "no acute fracture" and "no malignment" of her back. The CT scan of her back indicated "no acute bony abnormality." However, the MRI indicated that she had spondylosis in her back. Ms. Lawson acknowledged that since the August 20, 2018 accident, she had not had, nor had any doctor recommended her for surgery on her back, neck, or knee. She admitted at trial that the accident aggravated her preexisting conditions, although she denied any aggravation of her preexisting conditions in her interrogatories.

As for her injured knee, Ms. Lawson admitted that the x-rays from Hood indicated that she did not have a fracture, dislocation, or torn ligament in her right knee. However, the x-rays indicated degeneration in her right knee. She also acknowledged that the OLOL x-rays of her knee taken after the Hood x-rays found no acute pathology in her right knee. OLOL's MRI of her knee indicated full range of motion, but also degeneration.

Ms. Lawson acknowledged that she as diagnosed with anxiety in 2011 and 2012. However, at her DOT examination, she denied having anxiety, depression, nervousness, or other mental health problems. She also denied at the DOT examination having a sleep test done on her, although she admitted on cross-examination having a sleep test done in 2012. Ms. Lawson also acknowledged that in her interrogatories, she stated she had not been involved in a car accident five

15

years before or after August 20, 2018, although evidence had shown she had been involved in one car accident in 2015, and then another after August 20, 2018.

*Trevor Lawson*

Trevor Lawson, Ms. Lawson's husband since 2000, testified that prior to August 20, 2018, he and Ms. Lawson would frequently exercise and take walks in their neighborhood. He stated Ms. Lawson also taught dancing to children in 2011, when they were in their thirties. They also traveled frequently, usually on car trips. He testified that Ms. Lawson would normally take care of housework while he took care of yardwork. He and Ms. Lawson owned a company together until 2016, and prior to that, Ms. Lawson attended Southern University. She also took care of their grandson once he was born. Mr. Lawson testified that up until 2017, he was unaware of any injuries or physical difficulties Ms. Lawson might have had, nor was he aware of any medical procedures she might have had.

Mr. Lawson testified that since the accident of August 20, 2018, he has had to take on all of Ms. Lawson's physical household duties. She could no longer teach dancing or physically play with their grandson. She could no longer exercise and very seldom had sexual relations with him. Mr. Lawson also stated he has to assist Ms. Lawson with getting in and out of the bathtub and the car. Mr. Lawson then testified that he did remember Ms. Lawson being injured in the past, but that he never had to assist her with moving due to those injuries.

**CONCLUSION**

The Louisiana Supreme Court recently expounded on the important role of juries, noting that juries are held in high regard, and therefore great deference should be accorded in their decisions. See *Eastman v. State Farm Mutual Automobile Insurance Company*, 2023-01107 (La. 5/1/24), 384 So.3d 865, 872. Thus, overturning a jury's verdict that is reasonably supported by the record is, in essence, the denial of the parties' right to be heard and judged by the jury. *Id.*

After a thorough review of all the evidence contained in the record, we find that the jury's verdict was not manifestly erroneous or an abuse of its discretion. Ms. Lawson presented a large amount of evidence to substantiate her injuries. However, on cross-examination, the defendants sufficiently called Ms. Lawson's injuries into question. Most strikingly, Nurse Easley stated that she was not aware of a number of Ms. Lawson's preexisting health issues for the DOT examination because Ms. Lawson did not disclose them to her. Moreover, Ms. Lawson did not disclose to Dr. Katta her previous mental health diagnoses before Dr. Katta evaluated her. Dr. Warner, who independently examined Ms. Lawson, testified that at the time of the accident in question, Ms. Lawson already had a number of degenerative conditions in her neck, back, and knee that were not caused by the accident.

Ms. Lawson and the defendants presented competing evidence on the issue of her damages. The jury ultimately made a reasonable decision supported by the evidence, and concluded that the totality of evidence did not substantiate Ms. Lawson's claims beyond the $1,150.00 that was awarded, obviously finding that the evidence put forth by Ms. Lawson was not credible enough to award more. We therefore give the jury's verdict the deference to which it is entitled, and affirm the judgment incorporating the jury's findings. See _Harris v. Delta Development Partnership_, 2007-2418 (La. App. 1 Cir. 8/21/08), 994 So.2d 69, 77.

## DECREE

The judgment of the Twenty-First Judicial District Court, pursuant to the jury verdict awarding the plaintiff, Demetris Lawson, $1,150.00 in damages, is affirmed. Costs of this appeal are assessed to Demetris Lawson.

**AFFIRMED.**